<span style="color:red">**Electronically Filed
Intermediate Court of Appeals
CAAP-17-0000058
25-MAR-2021
07:54 AM
Dkt. 58 OP**</span>

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

---o0o---


MARILYN ALGHUSSEIN, Plaintiff-Appellant,
v.
KENNETH T. KAAN, M.D., KENNETH T. KAAN, M.D., INC.,
Defendants-Appellees,
and
JOHN DOES 1-5, JANE DOES 1-5, DOE CORPORATIONS 1-5,
DOE LLCS 1-5, DOE PARTNERSHIPS 1-5, DOE NON-PROFIT
ORGANIZATIONS 1-5, and DOE GOVERNMENTAL AGENCIES 1-5,
Defendants


NO. CAAP-17-0000058


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 1CC141001624)


MARCH 25, 2021


HIRAOKA, PRESIDING JUDGE, WADSWORTH AND NAKASONE, JJ.


OPINION OF THE COURT BY HIRAOKA, J.

Plaintiff-Appellant Marilyn Alghussein (**Alghussein**) underwent surgery performed by Defendants-Appellees Kenneth T. Kaan, M.D., and Kenneth T. Kaan, M.D., Inc. (collectively, **Dr. Kaan**). There was a bad result. Alghussein sued Dr. Kaan, claiming he failed to obtain her informed consent for the surgery. The circuit court entered two orders granting summary

judgment in favor of Dr. Kaan.[1]  A **Judgment** was entered on January 6, 2017.  Alghussein appealed.  We hold that Alghussein presented evidence creating a genuine issue of material fact about whether Dr. Kaan fully complied with the Hawaiʻi medical informed consent statute, Hawaii Revised Statutes (**HRS**) § 671-3 (Supp. 2008).  We vacate the Judgment in part and remand for proceedings consistent with this opinion.

## BACKGROUND

Alghussein, who was 62 years old, was experiencing low back pain.  She saw Dr. Kaan, an orthopedic surgeon.  Dr. Kaan diagnosed degeneration of the disc between Alghussein's 4th and 5th lumbar vertebrae.  On April 20, 2009, Dr. Kaan performed L4-5 fusion surgery using the "extreme lateral interbody fusion" (**XLIF**) procedure, in which the patient's spine is approached from the side.  The surgery was performed at The Queen's Medical Center, using neuromonitoring equipment made by NuVasive, Inc.[2]  A NuVasive representative was present during the surgery.

Alghussein signed a **Consent Form** four days before her surgery.  The Consent Form stated, in relevant part:

> (4)  I have been informed that there are many significant risks, such as severe loss of blood, infection, cardiac arrest, and other consequences including: <u>nerve/blood vessel damage, poor results, nonunion, loss of fixation</u> that can lead to death or permanent or partial disability, which can result from any procedure.
>
> . . . .
>
> (10)  I have been informed that a representative(s) of one or more medical device manufacturer(s) or other commercial vendor(s) ("Representative") may be present at the time of my surgical procedure.  I understand that the Representative(s) will not direct or perform my surgery, but may be available to my surgeon as a resource.  I hereby consent to the presence of the Representative(s) at my surgical procedure.

---

[1]  The Honorable Karl K. Sakamoto presided.

[2]  Alghussein filed a separate lawsuit against NuVasive, Inc. and The Queen's Medical Center in 2011.  Much of the evidence presented on Dr. Kaan's motions for summary judgment came from discovery conducted in that lawsuit.

. . . .

*I agree that my doctor has informed me of the:*

. . . .

(d)    alternative forms of treatment available, including non-treatment, with associated drawbacks and benefits[.]

(Underscored portions were handwritten onto the Consent Form.)

After the surgery Alghussein experienced new weakness in her left quadriceps muscle. Dr. Kaan believed the muscle weakness was most likely caused by an injury to the L-3 nerve root or femoral nerve during surgery, possibly when a retractor[3] pulled against the nerve.

### PROCEDURAL HISTORY

Alghussein filed a lawsuit against Dr. Kaan on July 25, 2014. Her complaint alleged that she had "permanent lower extremity weakness and she has been relegated to use of a wheel-chair after the surgery" performed by Dr. Kaan. She claimed that she "did not give an informed consent to the XLIF surgery, and if she had been given the information would not have consented to the XLIF surgery performed by [Dr. Kaan]."

Trial was set for the week of November 7, 2016. The trial setting order set deadlines for the parties to identify expert witnesses and exchange expert witness reports. After those deadlines passed, Dr. Kaan filed two motions for summary judgment. Each was supported by, among other things, a declaration by Dr. Kaan and exhibits, including excerpts from depositions taken in Alghussein's lawsuit against NuVasive, Inc. and The Queen's Medical Center.

The first motion for summary judgment argued that Alghussein could not sustain her burden of proving that Dr. Kaan

---

[3]    A "retractor" is a "surgical instrument[] [used] for holding tissues away from the field of operation." Retractor, Merriam-Webster, https://www.merriam-webster.com/dictionary/retractor (last visited Mar. 22, 2021).

failed to inform her of the material risks of the surgery, as required under HRS § 671-3(b)(5),[4] because Alghussein's expert witness did not offer any opinions on the issue.[5] Alghussein opposed Dr. Kaan's motion by submitting her own declarations and other evidence, including her interrogatory answers and excerpts from a number of depositions. The record does not contain a transcript of the hearing. On October 27, 2016, the circuit court entered an order granting in part and denying in part Dr. Kaan's first motion for summary judgment. The motion was granted as to Alghussein's claim under HRS § 671-3(b)(5), and "to the extent that [Alghussein] alleges that [Dr. Kaan] had a duty to disclose an alleged lack of experience with the subject medical device(s)[.]"

Dr. Kaan's second motion for summary judgment addressed Alghussein's claims under HRS § 671-3(b)(2), (4), and (6). Alghussein opposed Dr. Kaan's second motion by submitting her own declaration. The circuit court granted Dr. Kaan's second motion for summary judgment in total by order entered on October 27, 2016. The Judgment was entered on January 6, 2017. This appeal followed.

## STANDARD OF REVIEW

"Appellate courts review an award of summary judgment de novo under the same standard applied by the circuit court." Garcia v. Robinson, 137 Hawai‘i 388, 393, 375 P.3d 167, 172 (2016) (citation omitted). "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and

---

[4] The relevant portions of the statute are set forth below.

[5] The expert report proffered by Alghussein had been prepared by the physician who was retained by Alghussein's employer to perform an independent medical examination (**IME**) in connection with Alghussein's workers compensation claim. Although the IME doctor reviewed and summarized Dr. Kaan's medical records, the report expressed no opinions on whether or not Dr. Kaan failed to disclose a material risk of XLIF surgery or otherwise complied or failed to comply with HRS § 671-3(b).

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Id. (citations omitted). "A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." Id. (citations omitted). "The moving party bears the burden of demonstrating that there is no genuine issue as to any material fact with respect to the essential elements of the claim or defense and must prove that the moving party is entitled to judgment as a matter of law." Id. at 393-94, 375 P.3d at 172-73 (citation omitted). The evidence and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Id. at 394, 375 P.3d at 173.

## DISCUSSION

The issue presented by this appeal is whether the evidence presented on Dr. Kaan's motions for summary judgment, viewed in the light most favorable to Alghussein, created a genuine issue of material fact which should have precluded summary judgment.

### Medical Informed Consent

The liability issues in this case involve the Hawaiʻi medical informed consent statute, HRS § 671-3. The statute prescribes the standard for a physician's duty to disclose information to a patient, supplanting the common-law formulation of the doctrine of informed consent. Garcia, 137 Hawaiʻi at 396 n.7, 375 P.3d at 175 n.7 (citing Ngo v. Queen's Med. Ctr., 136 Hawaiʻi 54, 63-68, 358 P.3d 26, 34-40 (2015)).

> [A] plaintiff must prove the following elements for a claim of negligent failure to obtain informed consent:
>
> (1) the physician owed a duty of disclosure under HRS § 671-3(b);
>
> (2) the physician breached that duty;

5

> (3)   the patient suffered injury;
>
> (4)   the physician's breach of duty was a cause of the patient's injury in that
>
>> (a)   the physician's treatment was a substantial factor in bringing about the patient's injury and
>>
>> (b)   a reasonable person in the plaintiff patient's position would not have consented to the treatment that led to the injuries had the plaintiff patient been properly informed; and
>
> (5)   no other cause is a superseding cause of the patient's injury.

Garcia, 137 Hawaiʻi at 394, 375 P.3d at 173 (reformatted) (citing Ngo, 136 Hawaiʻi at 68-69, 358 P.3d at 40-41).

HRS § 671-3 provides, in relevant part:

> (b)   The following information shall be supplied to the patient . . . prior to obtaining consent to a proposed medical or surgical treatment[:]
>
>> (1)   The condition to be treated;
>>
>> **(2)   A description of the proposed treatment or procedure;**
>>
>> (3)   The intended and anticipated results of the proposed treatment or procedure;
>>
>> **(4)   The recognized alternative treatments or procedures, including the option of not providing these treatments or procedures;**
>>
>> (5)   The recognized material risks of serious complications or mortality associated with:
>>
>>> (A)   The proposed treatment or procedure;
>>>
>>> (B)   The recognized alternative treatments or procedures; and
>>>
>>> (C)   Not undergoing any treatment or procedure; and
>>
>> **(6)   The recognized benefits of the recognized alternative treatments or procedures.**

(The subsections at issue in this appeal appear in bold.)

**Alghussein's Contentions on Appeal**

Alghussein contends that the evidence presented on Dr. Kaan's motions for summary judgment, viewed in the light most favorable to her, showed that: **(1)** Dr. Kaan failed to adequately describe the proposed treatment or procedure as required by HRS § 671-3(b)(2); **(2)** Dr. Kaan failed to advise her of alternative treatment as required by HRS § 671-3(b)(4); **(3)** Dr. Kaan failed to advise her of the benefits of alternative treatment as required by HRS § 671-3(b)(6); and **(4)** a reasonable person would not have consented to the XLIF surgery had there been disclosure of the matters required by HRS § 671-3(b)(2), (4), and (6).

## 1. Description of the Proposed Procedure

HRS § 671-3(b)(2) requires that a physician supply the patient with "[a] description of the proposed treatment or procedure[.]" Dr. Kaan's declaration submitted in support of his first motion for summary judgment stated:

> 2. I performed the lumbar fusion surgery on [Alghussein] on April 20, 2009 using the Extreme Interbody Lateral [sic] Fusion ("XLIF") procedure and employing neuro-monitoring equipment provided by NuVasive, Inc.
>
> 3. Prior to the surgery, on or about April 16, 2009, I met with [Alghussein] to discuss the planned surgery. I explained the procedure to [Alghussein] and that I would approach her spine from the side, fuse her in the back, and insert a prosthesis bone graft, BMP (bone morphogenic protein) and screws from the back under a fusion.
>
> 4. Also on April 16, 2009, [Alghussein] signed and initialed a form entitled "Physician's Record of Patient Consent to Operation, Post-Operative Care, Medical Treat-ment, Anesthesia, or Other Procedure ("Consent Form")[.] . . .
>
> 5. The Consent Form described the planned procedure as "L4-5 extreme lumbar interbody fusion, posterolateral fusion, insertion pedicle screws and rods prosthesis, insert BMP, iliac crest bone graft, allograft." . . . The procedure was also described, in ordinary or lay language, as "fusion of the spine, front and back, insert cage, screws, rods. Bone protein, bone from pelvis or donor bone."

A copy of the Consent Form, bearing Alghussein's signature, was attached to Dr. Kaan's declaration.

Alghussein did not dispute reading or signing the Consent Form. Her September 28, 2016 declaration stated:

> 4.    I was told that the surgery would involve me being turned on my side for the surgery. . . .
>
> . . . .
>
> 9.    I was not told that Dr. Kaan would need to rely upon neuromonitoring equipment to do the XLIF surgery. . . . If I had been told about this reliance on the equipment rather than the surgery Dr. Kaan had done before, I would not have agreed to the surgery.

Her October 12, 2016 declaration stated:

> 3.    On April 16, 2009, before my surgery, I was told only that I would be turned on my side for my surgery and the surgery would approach my spine from the side.
>
> . . . .
>
> 6.    . . . I was not told that the XLIF would use the NuVasive [neuromonitoring] equipment[.] . . . I was not told that the NuVasive equipment was needed to perform the surgery that Dr. Kaan wanted to perform.

Alghussein does not dispute that Dr. Kaan described the proposed surgery to her in both medical and lay terms; nor does she contend that Dr. Kaan incorrectly described the procedure. Her first point of error is based upon Dr. Kaan not telling her that he would be using NuVasive neuromonitoring equipment during the procedure, and that a technician would be placing electrodes on her legs. Thus, she raises the issue of how much specific information a physician must provide to adequately describe "the proposed treatment or procedure" under HRS § 671-3(b)(2).

On that issue HRS § 671-3(a) provides, in pertinent part:

> **§ 671-3 Informed consent.** (a) The Hawaii medical board may establish standards for health care providers to follow in giving information to a patient, . . . to ensure that the patient's consent to treatment is an informed consent. The standards shall be consistent with subsection (b) and may include:

(1)     The substantive content of the information to be
        given;

(2)     The manner in which the information is to be
        given by the health care provider; and

(3)     The manner in which consent is to be given by
        the patient[.]

There is no evidence that the Hawaii medical board "establish[ed] standards for health care providers to follow" for the "substantive content of the information to be given" to a patient about lumbar interbody fusion surgery.  It does not appear that the medical board has established any such standards.  See Ngo, 136 Hawaiʻi at 64, 358 P.3d at 36 (noting that board of medical examiners did not fulfill mandate of former version of HRS § 671-3 "to specifically itemize the probable risks and effects of each specific treatment or surgical procedure" because "there were too many medical and surgical procedures to provide such an itemization.") (quoting Mroczkowski v. Straub Clinic & Hosp., Inc., 6 Haw. App. 563, 567, 732 P.2d 1255, 1258-59 (1987); see also Leyson v. Steuermann, 5 Haw. App. 504, 514 n.7, 705 P.2d 37, 45 n.7 (1985), overruled by Bernard v. Char, 79 Hawaiʻi 362, 903 P.2d 667 (1995) (adopting objective standard for determining whether patient would have undergone treatment had they been informed of the risk of the harm that in fact occurred); Hawaii Administrative Rules § 16-85-24 (stating the Hawaiʻi medical board "has determined that it is not practicable to set standards that include the substantive content of the information to be given a patient to insure that a patient's consent to treatment is an informed consent.").

On the record before us, we decline to recognize a standard requiring a surgeon to supply a patient with information about: the specific surgical tools or equipment to be employed in a proposed treatment or procedure; how the tools or equipment are to be used; or which member of the surgical team will perform what function during the treatment or procedure, to comply with

HRS § 671-3(b)(2).[6]  We hold that the information Dr. Kaan supplied to Alghussein to describe the XLIF surgery complied with HRS § 671-3(b)(2), and Alghussein did not raise a genuine issue of material fact about whether Dr. Kaan complied with HRS § 671-3(b)(2).

### 2.   Recognized Alternative Treatments or Procedures

HRS § 671-3(b)(4) requires that a physician supply the patient with information about "recognized alternative treatments or procedures, including the option of not providing these treatments or procedures[.]"

### A.   Genuine issues of material fact.

Dr. Kaan testified in deposition:

> Q. So what other procedures do you use besides XLIF procedures?
>
> A. As far as doing an interbody fusion, another approach is approaching it from the back; so you can say a posterior lumbar interbody fusion.  Or another approach is the transforaminal lumbar interbody fusion.

Dr. Kaan signed a declaration stating:

> 3.     Prior to the surgery, on or about April 16, 2009, I met with [Alghussein] to discuss the planned surgery.  I explained the procedure to [Alghussein] and that I would approach her spine from the side.  I told her that the other alternative to this XLIF approach was a posterior approach to the spine which would require more muscle dissection and carried an increased risk of morbidity as well as a longer recovery period.  In contrast, I told her, the XLIF lateral approach was less intrusive and required less muscle dissection.  Both approaches carried the same risk of nerve injury.

The Consent Form signed by Alghussein acknowledged that Dr. Kaan informed her of "alternative forms of treatment available, including non-treatment, with associated drawbacks and benefits[.]"

---

[6]     But see discussion below concerning HRS § 671-3(b)(4) and (6).

Alghussein's October 12, 2016 declaration stated:

2.    I have been informed about the Declaration of
      Kenneth T. Kaan, M.D., (Dr. Kaan) dated October 4,
      2016, specifically paragraph 3.  Dr. Kaan did not tell
      me about any alternative surgeries before my surgery
      on April 20, 2009.

3.    On April 16, 2009, before my surgery, I was told only
      that I would be turned on my side for my surgery and
      the surgery would approach my spine from the side.

4.    I was not told about an alternative approach.  I was
      not told about a posterior approach.  I was not told
      about the difference between the two types of surgery.
      Nothing was discussed about muscle dissection, or
      recovery periods or increased risk of mobility [sic]
      with the posterior approach or the XLIF being less
      intrusive.  I was not told that both approaches
      carried the same risk of nerve injury.

There is conflicting evidence about whether Dr. Kaan informed
Alghussein about the posterior approach, which Dr. Kaan
acknowledged in deposition was an alternative to the XLIF
approach.  The evidence in the record, when viewed in the light
most favorable to Alghussein, shows a genuine issue of material
fact about whether Dr. Kaan supplied Alghussein with information
about the posterior approach as an alternative to the XLIF
approach.  The circuit court erred in granting summary judgment
on Alghussein's claim under HRS § 671-3(b)(4).

### B.    **Sham declaration doctrine.**

The circuit court's order granting Dr. Kaan's second
motion for summary judgment relied on the "sham declaration"
doctrine:

> The Court, in viewing the totality of circumstances,
> concludes that [Alghussein]'s declaration in support of her
> Opposition to [Dr. Kaan's] **Second** Motion for Summary
> Judgment is a sham declaration.  This is because
> [Alghussein]'s declaration was "(1) produced to avoid
> summary judgment and (2) the inconsistencies [are] clear and
> unambiguous."  See Lales v. Wholesale Motors Co., 133
> Hawaiʻi 332, 360, 328 P.3d 341, 369 (2014);
>
> [Alghussein]'s only evidence contradicting both the
> Informed Consent Document and Dr. Kaan's testimony is
> [Alghussein]'s Declaration dated October 12, 2016 stating
> that [Dr. Kaan] did not tell her of any alternatives to the
> XLIF approach, including the posterior approach, and that

she was not aware of any alternative approach to the XLIF method. This testimony, however, **directly contradicts** [Alghussein]'s own Memorandum in Opposition, of which her declaration is an attachment to. [Alghussein]'s Memorandum in Opposition to [Dr. Kaan's] **Second** Motion for Summary Judgment at Page 11 states that "[Alghussein] relied, in **selecting** [Dr. Kaan] as her physician," on the fact that [Dr. Kaan] had been performing the posterior method "for a very long time." Thus, [Alghussein] acknowledges in her own memorandum that she was **aware of the posterior approach before even selecting Dr. Kaan as her doctor**. Thus, as [Alghussein]'s declaration is a sham declaration, it fails to create a genuine issue of material fact. To this extent, [Dr. Kaan's second] Motion for Summary Judgment is GRANTED.

(Bold text in original)(cleaned up)(bold underscoring added).

In <u>Lales v. Wholesale Motors Co.</u>, 133 Hawaiʻi 332, 328 P.3d 341 (2014), the supreme court discussed "a federal doctrine prohibiting 'sham affidavits.'" <u>Id.</u> at 360, 328 P.3d at 369.

> In general, the "sham affidavit" doctrine applies when the affidavit of a non-moving party in a motion for summary judgment contradicts or is inconsistent with [their] previous deposition testimony. Under this doctrine, a non-moving party generally cannot create a genuine issue of fact "simply by submitting an affidavit contradicting [their] own prior testimony."
>
> The purpose of the "sham affidavit" doctrine is to preserve "the utility of summary judgment as a procedure for screening out sham issues of fact." However, the sham affidavit doctrine does not prohibit the non-moving party from "elaborating upon, explaining, or clarifying prior testimony elicited by opposing counsel on deposition" in [the non-moving party's] affidavit. Furthermore, the sham affidavit doctrine does not prohibit attempts by the non-moving party to clarify inconsistencies that result from "an honest discrepancy, mistake, or newly discovered evidence."
>
> The Ninth Circuit has held that two requirements must be met before the court can strike an affidavit and grant summary judgment: (1) the trial court must make a factual determination that the contradiction was indeed a "sham" produced to avoid summary judgment and (2) the inconsistencies have to be clear and unambiguous to justify striking the affidavit. If either requirement is not met, the court must consider the non-moving party's affidavit in its determination to grant or deny summary judgment.

<u>Id.</u> (citations omitted). The supreme court then noted it had not explicitly adopted or rejected the sham affidavit doctrine, and did not need to resolve the issue in that case: "Even assuming arguendo that the sham affidavit doctrine is available, it would not be applicable in the instant case because Lales's declaration

was not clearly and unambiguously inconsistent with his prior deposition and admissions." Id.

Respectfully, we believe the circuit court misapplied the sham declaration doctrine. Alghussein submitted her own declaration in opposition to Dr. Kaan's <u>first</u> motion for summary judgment, stating:

> 5. . . . Dr. Kaan did not tell me that he could do the surgery from the rear (posterior)[.]

Alghussein's answers to Dr. Kaan's interrogatories, served before either motion for summary judgment was filed, stated:

> 12. Identify and set forth each and every claim being asserted against [Dr. Kaan] (e.g., assault, misrepresentation, etc.)
>
> Answer: Medical Malpractice; failure to properly disclose material information known by Dr. Kaan about surgery[.]
>
> He did not disclose:
>
> . . . .
>
> 4. He did not tell me I had different choices about what surgery I could have and did not need to do the XLIF.

Alghussein's second declaration did not contradict her first declaration or her interrogatory answers about whether Dr. Kaan discussed the alternative posterior approach with her. Nor did her deposition:

> Q. Okay. When you saw Dr. Kaan did he explain that there were a number of alternatives, including surgery, that could be pursued, or did he only advocate surgery?
>
> A. Well, I think at that point he only advocated surgery. He was aware of my time spent with Dr. Katsura [a physiatrist].
>
> Q. So really the only options, treatment options that you discussed with Dr. Kaan at that time were surgery?
>
> A. Yeah. . . .
>
> . . . .
>
> Q. Can you tell me in as much detail as you can remember what Dr. Kaan said to you before the surgery and what it would involve?
>
> A. I knew it involved turning me.

Q.  Sorry, turning you?

A.  Yes, um-hum.

Q.  What do you mean by that?

A.  That I think they took a piece from your hip and then I think you were on your side and then they laid you on your stomach.  I recall that being explained.  And then they did two incisions in your back.

Q.  (Attorney nods head.)

A.  And put in these two spacers on each side.

Q.  On each side of what?

A.  Your spine.

Q.  Anything else you can remember about how the surgery was described to you by Dr. Kaan?

A.  Pretty much like that.  And those spacers would alleviate the pain.

The deposition excerpts presented to the circuit court did not show that Alghussein was specifically asked whether Dr. Kaan explained to her the posterior approach or any other alternative to the XLIF procedure.  Alghussein's October 12, 2016 declaration was not "clearly and unambiguously inconsistent with" her previous declaration, her interrogatory answers, or her deposition testimony.  Lales, 133 Hawaiʻi at 360, 328 P.3d at 369.  Even if the sham declaration doctrine were to be recognized under Hawaiʻi law, the circuit court erroneously applied it to grant summary judgment for Dr. Kaan.

### 3.  Recognized Benefits of Recognized Alternative Treatments or Procedures

HRS § 671-3(b)(6) requires that a physician supply the patient with information about "[t]he recognized benefits of the recognized alternative treatments or procedures."

### A.  Genuine issues of material fact.

NuVasive's representative testified in deposition:

Q.  Okay.  Did you speak to Dr. Kaan and did he tell you that he was not comfortable with the [XLIF] procedure at this point?

14

A.   He said he wasn't comfortable with the procedure.

Q.   Okay.  So that was [sic] would have been sometime July — July, August or September of 2008, right?

A.   2008.

.  .  .  .

Q.   Okay.  Did Dr. Kaan indicate to you why he was not comfortable with the procedure?

A.   Just because he's been using the stuff he's been using for years and years and years, and it's a new procedure to him.

Q.   You mean the prost -- posterior approach?

A.   Uh-huh.

Q.   That's what he did before?

A.   Yes.

.  .  .  .

Q.   Okay.  And so when you said he attempted an XLIF in September, what did you mean by that?

A.   I think he -- I don't recall what I meant by that. I mean, I remember of [sic] specifically of one of his first cases that we went and we tried to position the patient, and he didn't feel comfortable accessing the spine, so we aborted and he went to a traditional posterior.

Before Dr. Kaan performed Alghussein's surgery, he had admittedly performed only four XLIF surgeries.  NuVasive's representative testified:

Q.   [Referring to a document]  And: "Dr. Kaan is committed to do 5 XLIF cases."  Is that right.

A.   Yes.

Q.   Okay.  So do you remember talking to Dr. Kaan and he said he was committed to do 5 XLIF cases?

A.   I heard him saying that he wanted to give it a shot and learn it, and he would do 5 and give it an evaluation after that.

Alghussein's surgery was Dr. Kaan's fifth XLIF case.

Alghussein's October 12, 2016 declaration stated:

2.   I have been informed about the Declaration of Kenneth T. Kaan, M.D., (Dr. Kaan) dated October 4, 2016, specifically paragraph 3.  Dr. Kaan did

15

> not tell me about any alternative surgeries before my surgery on April 20, 2009.
>
> 3. On April 16, 2009, before my surgery, I was told only that I would be turned on my side for my surgery and the surgery would approach my spine from the side.
>
> 4. I was not told about an alternative approach. I was not told about a posterior approach. I was not told about the difference between the two types of surgery. Nothing was discussed about muscle dissection, or recovery periods or increased risk of mobility [sic] with the posterior approach or the XLIF being less intrusive. I was not told that both approaches carried the same risk of nerve injury.
>
> 5. If I had been told about alternative surgery procedures, I would have asked questions.
>
> . . . .
>
> 7. I would have asked how much experience Dr. Kaan had with each of the alternative approaches. . . .
>
> . . . .
>
> 9. I would have asked Dr. Kaan about his experience with the posterior approach which I understand he had done for many years before he decided to try the new XLIF surgery.
>
> . . . .
>
> 12. . . . If I knew there were alternate procedures, I definitely would have asked him about his experience with XLIF.

Viewing this evidence in the light most favorable to Alghussein, the trier of fact could conclude that Dr. Kaan did not discuss the recognized benefits of the alternative posterior approach with Alghussein because he had committed to NuVasive that he would perform five XLIF procedures, and Alghussein's surgery would have been the fifth if Alghussein consented to it.

### B.  Argument is not evidence.

Dr. Kaan argues Alghussein "readily admitted that she knew about the posterior approach and specifically selected Dr. Kaan for that reason and purpose[.]"  Dr. Kaan cites to Alghussein's memorandum in opposition to Dr. Kaan's second motion for summary judgment, which argued:

> Dr. Kaan did not disclose the obvious benefit of the posterior approach procedure, which was that he had been performing this procedure for a very long time. <u>This was the procedure upon which Dr. Kaan had earned his reputation and upon which [Alghussein] relied in selecting him as her physician</u>. The benefit of this procedure is that he had much more experience doing it. The evidence shows that Dr. Kaan wanted to use the XLIF procedure in his effort to learn this new surgical procedure.

(Underscoring added.) "[A]rgument of counsel in a memorandum of law is not evidence" for purposes of a motion for summary judgment. <u>Leis Family Ltd. P'ship v. Silversword Eng'g</u>, 126 Hawaiʻi 532, 534 n.2, 273 P.3d 1218, 1220 n.2 (App. 2012) (cleaned up). Although Alghussein admittedly thought that Dr. Kaan had a good reputation as an orthopedic surgeon, there is no <u>evidence</u> in the record that Alghussein was aware of the alternative surgical approaches, or that Dr. Kaan's good reputation was based upon him performing a specific surgical approach, before she agreed to undergo XLIF surgery.

### C.   <u>Legal causation.</u>

Dr. Kaan argues that Alghussein's claims for lack of informed consent "are based upon collateral issues which have no causal relationship to the injury which she is now complaining of [sic]." We disagree. Dr. Kaan correctly contends that a plaintiff claiming negligent failure to obtain informed consent must prove that the physician's breach of duty to disclose under HRS § 671-3(b) was a cause of the patient's injury in that: "(a) the physician's treatment was a substantial factor in bringing about the patient's injury[;] and (b) a reasonable person in the plaintiff patient's position would not have consented to the treatment that led to the injuries had the plaintiff patient been properly informed[.]" <u>Garcia</u>, 137 Hawaiʻi at 394, 375 P.3d at 173 (citing <u>Ngo</u>, 136 Hawaiʻi at 68-69, 358 P.3d at 40-41). However, the Hawaiʻi Supreme Court has noted that "Hawaiʻi courts have not required plaintiffs claiming the failure to disclose an alternative treatment to prove that they were injured by a risk that was not disclosed to them." <u>Ray v.</u>

Kapiolani Med. Specialists, 125 Hawaiʻi 253, 266, 259 P.3d 569, 582 (2011).

Dr. Kaan argues that Alghussein proffered no expert opinion testimony to support her claims that the weakness in her left quadriceps muscle was caused by Dr. Kaan's improper performance of the XLIF surgery. But Alghussein's claim is not based upon surgical negligence; it is for failure to obtain informed consent. "[E]xpert testimony is not required to determine what a reasonable patient needs to hear in order to make an informed decision regarding proposed medical treatment." Ngo, 136 Hawaiʻi at 66 n.14, 358 P.3d at 38 n.14.

> Hawaiʻi courts have adopted the ***patient-oriented standard*** for determining whether particular information must be disclosed to a patient. This court has held that the "dispositive inquiry regarding the physician's duty to disclose in an informed consent case, therefore, is not what the physician believes [their] patient needs to hear in order for the patient to make an informed and intelligent decision; ***the focus should be on what a reasonable person objectively needs to hear from [their] physician to allow the patient to make an informed and intelligent decision regarding proposed medical treatment***."

Ray, 125 Hawaiʻi at 267, 259 P.3d at 583 (emphasis added) (quoting Carr v. Strode, 79 Hawaiʻi 475, 485–86, 904 P.2d 489, 499–500 (1995)).

Viewing the evidence in the light most favorable to Alghussein, the trier of fact could find that a reasonable person may "objectively need[] to hear" that their physician had only performed four XLIF surgeries like the one proposed, and that the physician was more experienced in, and had a track record of success while, using other approaches to interbody fusion surgery, "to make an informed and intelligent decision regarding proposed medical treatment." Ray, 125 Hawaiʻi at 267, 259 P.3d at 583 (citation omitted). In other words, a reasonable trier of fact could conclude that Alghussein objectively needed to hear from Dr. Kaan that the proposed XLIF procedure was a relatively new surgical approach (for him), and that he ordinarily used the posterior approach, to allow her to make an informed and

intelligent decision whether she wanted Dr. Kaan to use the XLIF approach under the circumstances.

### D. Duty to disclose.

Dr. Kaan cites <u>Ditto v. McCurdy</u>, 86 Hawaiʻi 84, 947 P.2d 952 (1997) and <u>Ray</u> for the proposition that a physician has no duty to disclose to their patient their experience (or lack thereof) in performing the procedure at issue.  Both cases are distinguishable.

The defendant in <u>Ditto</u> was an ear, nose, and throat specialist and cosmetic surgeon who performed breast augmentation surgery on the plaintiff.  The doctor did not disclose to the plaintiff that he was not a plastic surgeon and did not have hospital privileges.  The supreme court held, as a matter of law, that "a physician does not have an affirmative duty to disclose [their] qualifications to a patient prior to providing treatment."  <u>Ditto</u>, 86 Hawaiʻi at 90, 947 P.2d at 958.  Unlike this case, <u>Ditto</u> did not involve the failure of the defendant to disclose that he had significantly more experience using one approach to breast augmentation surgery than another, so that the patient could make an informed decision about which approach she wanted the surgeon to take for her breast augmentation surgery.

In <u>Ray</u>, the patient (a minor visiting Hawaiʻi with her parents) had severe lupus with brain involvement.[7]  A Hawaiʻi physician proposed "steroid pulse therapy."  The physician informed the patient's parents (the **Rays**) that persons treated with steroids had a risk of developing steroid myopathy (a form of muscle weakness), and that the risk of side effects from steroids generally increases with the dosage level.  The physician did not advise the Rays about alternative dosing regimens.

---

[7]  "Lupus is a disease that involves the inflammation of any part of the human body.  Lupus patients with brain involvement have a higher risk of dying."  <u>Ray</u>, 125 Hawaiʻi at 257, 259 P.3d at 573.

During the treatment period in Hawaiʻi the patient began experiencing muscle weakness. The steroid pulse therapy was discontinued and the patient returned home. The muscle weakness progressed. The patient was hospitalized for six months because she could not breathe on her own, was profoundly weak, and was severely limited in her ability to move. Four of her attending doctors opined that her weakness was caused by the steroids she had received in Hawaiʻi.

The Rays filed a lawsuit, claiming (among other things) that the Hawaiʻi physician (an employee of the defendant medical group) failed to obtain their informed consent for treatment of their daughter. Their expert witness testified that although there were different ways of treating a lupus patient with steroids, he had never seen the pulse therapy treatment used by the Hawaiʻi physician.[8] Over objection, the expert testified that "a very important part of informed consent is for the doctor to tell the patient or the parents what [the doctor's] experience has been with that form of treatment." Ray, 125 Hawaiʻi at 259, 259 P.3d at 575. The Rays testified that they would not have consented to their daughter's treatment had they known of the Hawaiʻi physician's and the medical community's lack of experience with the treatment program. The jury returned a verdict for the Rays and both sides appealed.

On the issue of informed consent, the supreme court held that the circuit court erred by allowing the Rays' expert to testify that the Hawaiʻi physician owed a duty to disclose her and the medical community's experience with the steroid pulse therapy treatment program. Ray, 125 Hawaiʻi at 268-69, 259 P.3d at 584-85. The supreme court based its decision on the language

---

[8]  The Hawaiʻi treating physician testified that she had applied the steroid treatment program to hundreds of patients, and that she had only seen a small number of patients develop life-threatening side effects. She testified that, in the hundreds of patients she had treated using that method, she never encountered any muscle weakness that she thought was induced by the treatment. Another doctor testified about a study which used the steroid more aggressively than the Hawaiʻi doctor's method, and the 213 patients in that study did not suffer acute steroid myopathy.

of the informed consent statute in effect at the time the Rays' daughter was treated.  The statute required a physician to inform the patient of the "nature and character of the proposed treatment[.]"  HRS § 671-3(b)(2) (1993).  Referring to the plain meaning of the terms "nature" and "character," the supreme court held that a physician's "experience with pulse therapy is not a distinguishing feature or attribute of steroid pulse therapy." Ray, 125 Hawaiʻi at 269, 259 P.3d at 585.  Thus, when the supreme court held that the Rays' expert's "testimony that a physician should disclose her experience with a treatment to properly obtain informed consent was contrary to Hawaiʻi law[,]" id., the law referred to was HRS § 671-3(b)(2) (1993), id. at 268-69, 259 P.3d at 584-85.

In 2003, HRS § 671-3(b)(2) was amended, effective January 1, 2004, by deleting the requirement that a physician disclose the "nature and character" of the proposed treatment, and replacing it with a requirement to provide a "description of the proposed treatment or procedure[.]"  2003 Haw. Sess. Laws. Act 114, § 2 at 221-22.  Subsection (b)(2) has not been amended since.  As discussed in section 1. above, as a matter of law Dr. Kaan complied with HRS § 671-3(b)(2).  But Alghussein's claim that Dr. Kaan should have informed her he had significantly more experience performing posterior interbody fusion surgery, compared to his relatively new exposure to the XLIF approach, is not based on HRS § 671-3(b)(2); it is based on HRS § 671-3(b)(6), which requires that the patient be supplied with information about "[t]he recognized benefits of the recognized alternative treatments or procedures."

The evidence in this case, viewed in the light most favorable to Alghussein, could show that there were at least two alternative approaches to interbody fusion surgery: posterior and XLIF, or "extreme lateral."  Dr. Kaan had much experience performing the former, but had only completed four of the latter when he saw Alghussein.  Under the patient-oriented standard applied in Hawaiʻi, the issue of whether Dr. Kaan breached his

duty under HRS § 671-3(b)(6) is for the trier of fact, which must decide whether a reasonable person in Alghussein's position would "objectively need[] to hear" that Dr. Kaan had only performed four XLIF surgeries like the one proposed, and that he was significantly more experienced in the posterior approach, "to make an informed and intelligent decision regarding proposed medical treatment." Ray, 125 Hawaiʻi at 267, 259 P.3d at 583 (citation omitted). The circuit court erred by granting summary judgment on Alghussein's claim under HRS § 671-3(b)(6).

## CONCLUSION

For the foregoing reasons: the October 27, 2016 order granting in part and denying in part Dr. Kaan's first motion for summary judgment is affirmed as to Alghussein's claim under HRS § 671-3(b)(5), but vacated to the extent it ruled that Dr. Kaan did not have a duty to disclose his alleged lack of experience with the XLIF procedure; the October 27, 2016 order granting Dr. Kaan's second motion for summary judgment is affirmed as to Alghussein's claim under HRS § 671-3(b)(2), but vacated as to Alghussein's claims for alleged breach of HRS § 671-3(b)(4) and (6); and this case is remanded for further proceedings consistent with this opinion.

On the briefs:                          /s/ Keith K. Hiraoka
                                        Presiding Judge
Charles H. Brower,
for Plaintiff-Appellant                 /s/ Clyde J. Wadsworth
Marilyn Alghussein.                     Associate Judge

John S. Nishimoto,                      /s/ Karen T. Nakasone
Ronald T. Michioka,                     Associate Judge
Ryan I. Inouye,
for Defendants-Appellees
Kenneth T. Kaan, M.D. and
Kenneth T. Kaan, M.D., Inc.